DECISION AND JUDGMENT ENTRY
{¶ 1} Nathaniel Alexander was originally charged with murder in a complaint filed in municipal court. After he waived a preliminary hearing, the municipal court bound the case over to the court of common pleas for review by the grand jury, which "no billed" the charge. After a two-year delay, the State presented the matter to a new grand jury, which returned an indictment against Alexander for aggravated murder. On appeal from his conviction for murder, Alexander contends that the trial court violated his statutory rights to a speedy trial.
 {¶ 2} Based upon the trial court's failure to dismiss the original charge and release him from his bond, Alexander argues that the time between the initial grand jury's report to the court, which indicated that it had failed to return an indictment, and his subsequent indictment by a different grand jury counted against the State. Thus, he *Page 2 
contends that a case was continuously "pending" against him for more than 270 days and that the State failed to bring him to trial within the statutory time period. However, because the original grand jury issued a "no bill" against Alexander and failed to indict him before the court discharged it, the common pleas court lost jurisdiction over the original case. Thus, during the period from the discharge of the original grand jury until the subsequent grand jury issued its indictment, no charge was "pending" for purposes of calculating statutory speedy trial time. And, Alexander's bail obligations also terminated by operation of law at that time even though the court failed to formally release the bond. Therefore, the time between the grand jury's "no bill" and the subsequent indictment does not count against the State. Because Alexander does not contest any other procedural delays, we conclude the State brought him to trial within the statutory time frame.
 {¶ 3} Next, Alexander contends that the State violated his constitutional right to a speedy trial because the State allowed the case to remain pending for over two years before obtaining an indictment and then failed to arraign him for another 18 months. We agree that the delay prior to Alexander's trial was "uncommonly" long, and thus presumptively prejudicial. However, the record shows that through no fault attributable to the State, witnesses failed to cooperate during the initial investigation in 2003. After a "break" occurred in 2004 when a certain witness came forward, the State was able to complete the investigation and obtain an indictment in 2005. Later, after Alexander was indicted, he was a "fugitive avoiding apprehension," and then, following his arrest, he was in prison on unrelated charges and never requested disposition of his indictment. Because the State had a legitimate reason for the delay and because Alexander fails to *Page 3 
demonstrate any actual prejudice, we conclude that the State did not violate his constitutional speedy trial rights.
 {¶ 4} In his second assignment of error, Alexander contends that the trial court erred in refusing his request under Evid. R. 612 to review certain police reports three officers used prior to their testimony to refresh their recollection. Because production of these reports is controlled by Crim. R. 16(B), not Evid. R. 612, we cannot conclude that the trial court abused its discretion as Alexander contends. A defendant cannot use Evid. R. 612 to circumvent the discovery proceedings in a criminal case. And even assuming that Evid. R. 612 applied to these reports, Alexander cannot demonstrate resulting prejudice. Defense counsel initially sought to review one of the reports for the sole purpose of cross-examining a police officer concerning the victim's statement that he had been shot by a "white guy." Because the State had previously provided the victim's statement as Brady material and because defense counsel later elicited testimony from another police officer that the victim had in fact made that statement, Alexander fails to demonstrate any resulting prejudice. Accordingly, we reject his contention that the trial court abused its discretion here.
 {¶ 5} In his third assignment of error, Alexander contends that his murder conviction was against the manifest weight of the evidence and only justified a conviction of voluntary manslaughter. He argues that prior to the shooting he and the victim had been engaged in an altercation, during which the victim was the aggressor. However, the State presented more than sufficient direct and circumstantial evidence to show that Alexander shot and killed the victim and that he did so "purposely." The evidence demonstrates that immediately prior to the shooting, Alexander made a statement *Page 4 
concerning his intention to shoot the victim. The evidence also suggests that just before the shooting, Alexander was physically separated from the victim and that Alexander then pulled out a gun, "ran" over to the couch where the victim was being held down, and shot him in the lower back. Given this evidence, we cannot conclude that the jury clearly lost its way in concluding that he acted with the specific intent to kill. Although Alexander and the victim had been engaged in an altercation prior to the shooting, the evidence shows that Alexander caused the underlying argument that led to the physical altercation and that he punched the victim first. Even though the victim punched Alexander back and pinned him in a chair, we cannot say that the jury lost its way in rejecting Alexander's claim that the victim's actions were reasonably sufficient to incite Alexander into using deadly force. Thus, we reject his contention that his murder conviction was against the manifest weight.
 I. The Procedural History {¶ 6} On July 16, 2003, the State filed a complaint against Alexander in the Portsmouth Municipal Court charging him with one count of murder, under case number 03-CR-1806. Alexander was arrested on a warrant on August 11, 2003, and he appeared in court later that day. After the court established a $50,000 surety bond, Alexander posted it and was released that same day. On August 15, 2003, Alexander waived his right to a preliminary hearing, and the case was bound over to the Scioto County grand jury and assigned Scioto County Common Pleas Court No. 03-CR-653. That court continued his bond, ordering him to be held under a $50,000 surety bond "for the appearance in the Scioto Court of Common Pleas for trial pursuant to indictment by the Scioto County Grand Jury." On November 19, 2003, the grand jury returned a report to *Page 5 
the court indicating that it failed to return an indictment on that case. Specifically, the report stated: "Against the following named accused persons, who have been held to answer, no indictment has been found, (Revised Sec. 2939.23) to-wit: * * * 03-CR-653 Nathaniel J. Alexander." The court discharged the Grand Jury after receiving the report.
 {¶ 7} On August 26, 2005, a new Scioto County grand jury indicted Alexander on one count of aggravated murder, along with a firearm specification, under case number 05-CR-1247. It is undisputed that the indictment was premised upon the same facts as his initial murder charge. On November 9, 2006, Alexander was arrested in Franklin County, Ohio, and held on the warrant and two probation violations. Shortly thereafter, the Franklin County Common Pleas Court ordered Alexander to be held without bond and instructed Scioto County officials to pick him up within five days. However, that did not occur.
 {¶ 8} After Alexander was committed to prison on his Franklin County charges, he was transported to Scioto County for his March 2, 2007 arraignment in the present case. There, Alexander entered a not guilty plea and received appointed counsel. Defense counsel filed a request for a bill of particulars and a request for discovery. After a pretrial hearing, the court set the trial date for June 4, 2007. However, the court continued the trial date because the State had not provided the defense with discovery. After new counsel filed a notice of appearance, the court ultimately scheduled the trial for August 6, 2007. Then on July 26, 2007, new counsel filed a motion to dismiss, arguing that the State had violated Alexander's constitutional and statutory rights to a speedy trial. On November 7, 2007, the court denied the motion to dismiss and set the matter for trial. In denying the motion, the court stated: *Page 6 
 This Court finds that on November 19, 2003 the Scioto County Grand Jury returned a "no bill" in case number 03-CR-1806. The defendant was indicted in this case on August 26, 2005 and arraigned on March 2, 2007.
 This Court finds there was no charge pending against the defendant from November 19, 2003 through August 26, 2005 and the State of Ohio is not charged with this time pursuant to O.R.C. 2945.71.
 The Court further finds the defendant's motion as it pertains to the delay from August 26, 2005 until arraignment on March 2, 2007 is not well taken in that the defendant had felony charges pending in another jurisdiction and was a fugitive avoiding apprehension.
 {¶ 9} Finally, on February 6, 2008, the matter proceeded to trial.
 II. The Trial {¶ 10} Although many witnesses testified at length during the trial, only an abbreviated summary of the events is necessary at this point. However, we have also included a more detailed summary of the evidence as an appendix to the opinion so that a full comprehension of the manifest weight of the evidence analysis is possible.
 {¶ 11} During an "after hours party" at a Portsmouth apartment, Jordon Payton was fatally shot after a confrontation between the victim and at least two other individuals, including Alexander. During the course of the party, which involved alcohol and gambling, matters got out of hand over whether one of the gamblers, "D-Rock", had failed to pay Payton the money D-Rock bet on a game of dice. Alexander intervened in the argument, which escalated when Alexander punched Payton, who retaliated by punching Alexander, slamming his head into the wall, and pinning him in a chair. After someone pulled Payton off Alexander, and pushed Payton onto a couch, Alexander shot Payton once in the side or back. Alexander then fled the apartment and later exclaimed, "Oh my God, I just shot him over $30.00." *Page 7 
 {¶ 12} After the jury found Alexander guilty of the lesser included offense of murder with a firearm specification, the court sentenced Alexander appropriately.
 {¶ 13} After sentencing, the court agreed to hear additional testimony and evidence on the motion to dismiss for lack of speedy trial. At an evidentiary hearing Alexander presented Detective Charles, who testified about a comment he made during an interview of a potential witness about the 2003 grand jury. He stated that he told the witness he thought there would be enough evidence to indict, but that the prosecutor would not let the grand jury vote. He testified that he was under that impression because he never saw any information concerning whether the grand jury returned a true bill or a no bill. During the hearing, however, the State presented Detective Charles with a copy of the grand jury's November 19, 2003 report, which was admitted into evidence. Then he testified that based on his review of the report, he believed that the case was actually "no billed" by the grand jury. Following the hearing, the court again denied the motion to dismiss. Alexander now appeals.
 III. Assignments of Error {¶ 14} Alexander presents three assignments of error:
 I. THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE CHARGE ON THE BASIS THAT THE DEFENDANT HAD BEEN DEPRIVED OF HIS RIGHTS OF SPEEDY TRIAL PURSUANT TO O.R.C. § 2945.71, ET SEQ., SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTION II OF THE OHIO CONSTITUTION. (Judgment Entry filed February 28, 2008)
 II. THE TRIAL COURT ERRED IN REFUSING TO PERMIT COUNSEL FOR THE DEFENDANT TO REVIEW THE SUMMARIES AND STATEMENTS UTILIZED BY CERTAIN WITNESSES TO REFRESH THEIR RECOLLECTION PRIOR TO THEIR TESTIMONY IN 2008 PURSUANT TO THE PROVISION OF EVIDENCE RULE 612. (Tr. Pages 133, 192, 277-278, 334-335) *Page 8 
 III. THE VERDICT OF THE JURY AND THE JUDGMENT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. (Judgment Entry Filed February 15, 2008)
 IV. The Right to Speedy Trial {¶ 15} Ohio recognizes both a constitutional and statutory right to a speedy trial. See, e.g., State v. King, 70 Ohio St.3d 158,1994-Ohio-412, 637 N.E.2d 903, syllabus. R.C. 2945.71 embodies the statutory right and states, "a person against whom a charge of felony is pending shall be brought to trial within two hundred seventy days after his arrest." R.C. 2945.71(C)(2). Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution embody the constitutional right to a speedy trial. State v.Selvage, 80 Ohio St.3d 465, 466, 1997-Ohio-287, 687 N.E.2d 433. See, also, Klopfer v. North Carolina (1967), 386 U.S. 213, 223, 87 S.Ct. 988,18 L.Ed.2d 1 (applying the Sixth Amendment to the states through application of the Fourteenth Amendment). Alexander argues that the State deprived him of both of these rights. When reviewing a speedy trial issue, we are presented with a mixed question of law and fact.State v. Hiatt (1997), 120 Ohio App.3d 247, 261, 697 N.E.2d 1025. While we accept the trial court's factual findings if they are based upon competent, credible evidence, we review the trial court's application of the law to those facts de novo. Id.
 A. Statutory Right to Speedy Trial {¶ 16} R.C. 2945.71(C)(2) provides that a criminal defendant who is charged with a felony must be brought to trial within 270 days of his or her arrest. Under R.C. 2945.71(E), each day that a defendant is incarcerated in lieu of bond on the pending charge counts as three days. Under R.C. 2945.72, the time for bringing a criminal defendant to trial may be extended for certain periods of time, including: *Page 9 
 (A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;
 (B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;
 (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;
 (D) Any period of delay occasioned by the neglect or improper act of the accused;
 (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
 * * *
 (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion * * *
 {¶ 17} An accused presents a prima facie case for discharge by demonstrating that his case was pending for a time exceeding the statutory limits provided in R.C. 2945.71. State v. Butcher (1986),27 Ohio St.3d 28, 30-31, 500 N.E.2d 1368. The burden then shifts to the state to show that the time limit was extended under R.C. 2945.72. Id. at 31. We construe extensions of time under R.C. 2945.72 strictly against the state. State v. Singer (1977), 50 Ohio St.2d 103, 105-06,362 N.E.2d 1216.
 {¶ 18} When computing any period of time prescribed by an applicable statute, the date of the act or event from which the period begins to run is not included. State v. Staffin, Ross App. No. 07CA2967,2008-Ohio-338, ¶ 9; R.C. 1.14; Crim. R. 45(A). Thus, *Page 10 
the time in which the State had to bring Alexander to trial began running on August 12, 2003, the day after he was arrested and released on bail. The parties agree that the period between his initial arrest and August 15, 2003, i.e., the date he waived his preliminary hearing and the case was bound over to the grand jury, is chargeable to the State. They also agree that the statutory time limit continued to run through the period of time taken in the grand jury process. In other words, they concur that at least until November 19, 2003, i.e., the date the grand jury issued its report to the court, is also chargeable to the State. See, e.g., Oregon v. Kohne (1997), 117 Ohio App.3d 179,690 N.E.2d 66 (holding that the days between the date the case was bound over to the grand jury and the subsequent "no bill" were chargeable against the state). Accordingly, we find the State is charged with 100 days for the period between the arrest and the "no bill."
 {¶ 19} Citing the Supreme Court of Ohio's decision in State v.Azbell, 112 Ohio St.3d 300, 2006-Ohio-6552, 859 N.E.2d 532, Alexander contends that the case against him was continuously "pending" for purposes of computing his speedy-trial time even after the grand jury issued its November 19, 2003 report. In Azbell the court held: "For purposes of calculating speedy-trial time pursuant to R.C. 2945.71(C), a charge is not pending until the accused has been formally charged by a criminal complaint or indictment, is held pending the filing of charges, or is released on bail or recognizance." He points out that after being bound over to the grand jury and transferred to the common pleas court under case number 03-CR-653, the court never officially terminated the case and he was never released from bond. He argues that the grand jury's November 19, 2003 report to the court, which indicated that no indictment had been found against him, did not officially terminate the case or otherwise release him from the conditions of his *Page 11 
bail. Thus, he contends his case was continuously "pending" against him since his arrest in August 2003 and that his speed-trial rights were violated in mid May 2004.
 {¶ 20} In light of the fact that the common pleas court did not dismiss Case No. 03-CR-653 and/or release him from his bond, we must determine whether a charge was considered "pending" against Alexander for purposes of calculating speedy-trial time under R.C. 2945.71(C) during the time between the grand jury's initial "no bill" and the subsequent indictment. In other words, we must decide if the original charge was terminated by operation of law. We conclude that it was.
 {¶ 21} The grand jury is under the control and direction of the court of common pleas, which is charged with certain duties and responsibilities in a supervisory capacity. State v. Mitrovich (1983),4 Ohio St.3d 220, 221, 448 N.E.2d 800, citing R.C. 2939.01 et seq. and Crim. R. 6. The grand jury is essentially an arm of the court, and R.C. 2939.10, which gives the prosecuting attorney or assistant prosecuting attorney access to the grand jury, does not in any way alter that basic relationship. Id. Chapter 2939 of the Ohio Revised Code and Crim. R. 6 set forth the duties and responsibilities of the grand jury. Under R.C. 2939.23, the foreman must notify the court of common pleas if the grand jury fails to return an indictment against an accused. Moreover, Crim. R. 6(F) provides: "If the defendant is in custody or has been released pursuant to Rule 46[1] and seven jurors do not concur in finding an indictment, the foreman shall so report to the court forthwith." R.C. 2939.24 states that if a person held in jail charged with an indictable offense is not indicted at the term of court at which he is held to answer, he must be discharged unless *Page 12 
certain limited circumstances apply.[2] However, Crim. R. 6, which governs the duration of service of a grand jury, states:
 A grand jury shall serve until discharged by the court. A grand jury may serve for four months, but the court upon a showing of good cause by the prosecuting attorney may order a grand jury to serve more than four months but not more than nine months. The tenure and powers of a grand jury are not affected by the beginning or expiration of a term of court.
 {¶ 22} Initially, we address Alexander's contention that the grand jury did not in fact issue a "no bill." Alexander argues that Detective Charles' testimony at the hearing suggests that the prosecutor never permitted the grand jury to vote on the case. He also argues that there is no evidence to show that the grand jury complied with Crim. R. 6 by filing a report with the court "forthwith" indicating that seven jurors did not concur in finding an indictment. The State on the other hand contends that the grand jury's November 19, 2003 report to the court constituted a "no bill."
 {¶ 23} The term "no bill" is not defined in Chapter 2939. However, as used in R.C. 2953.51 to R.C. 2953.55, which address the sealing of records after a not guilty finding, dismissal of proceedings or no bill, the term "no bill" means "a report by the foreperson or deputy foreperson of a grand jury that an indictment is not found by the grand jury against a person who has been held to answer before the grand jury for the commission of an offense." R.C. 2953.51. Using this definition, we conclude that the grand jury's report to the court indicating that no indictment had been found against Alexander constituted a "no bill." Thus, the grand jury issued a "no bill" against Alexander on November 19, 2003, and the State failed to obtain the necessary indictment against Alexander as of that date. Likewise, it appears from the report that the court discharged the Grand Jury on that date. *Page 13 
 {¶ 24} Under Article I, Section 10 of the Ohio Constitution, "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." As we have previously held, it is well-settled law that "[t]here can be no trial, conviction, or punishment for a crime without a formal and sufficient accusation. In the absence thereof the court acquires no jurisdiction whatever, and if it assumes jurisdiction, a trial and conviction are a nullity." Stewart v. State (1932), 41 Ohio App. 351, 181 N.E. 111. Thus, a defendant cannot be tried, convicted or punished for a crime without a formal and sufficient indictment or information. See, e.g., State v.Brown (1981), 2 Ohio App.3d 400, 402, 442 N.E.2d 475; see, also,Akron v. Meissner (1993), 92 Ohio App.3d 1, 633 N.E.2d 1201. And if a court assumes jurisdiction over an improperly commenced felony prosecution, the trial and conviction would be a nullity. See State ex.rel. Flint v. Dinkelacker, 156 Ohio App.3d 595, 2004-Ohio-1695,807 N.E.2d 967, ¶ 21. Because a proper indictment is required in order for the trial court to proceed with jurisdiction over the matter, we conclude that a court does not retain jurisdiction over a charge bound over to the grand jury when the grand jury issues a "no bill" and is discharged.
 {¶ 25} Here, the State failed to obtain the required indictment against Alexander when the grand jury issued its "no bill". And, the trial court lost jurisdiction of the charge against Alexander, i.e., the murder charge bound over to the grand jury, after it discharged the grand jury. See, e.g., State v. Woods (June 16, 1988), Franklin App. No. 87AP736, 1988 WL 64003, noting that there were no charges pending against the defendant (who had been charged with murder, bound over to the grand jury, and *Page 14 
released on bond) between the time the grand jury returned a "no bill" and a later indictment.
 {¶ 26} While Alexander correctly contends that neither the State nor the trial court filed a dismissal entry for case number 03-CR-653, we conclude the case terminated automatically by operation of law when the common pleas court lost jurisdiction by virtue of the discharge after the "no bill." In other words, while "Case No. 03-CR-653" remained open in the court's docket, it was a legal nullity at that point. And accordingly, there was no charge "pending" against Alexander for purposes of his speedy trial rights.
 {¶ 27} Alexander also contends that the speedy trial time continued to run following the "no bill" because the court never officially released him from bond. Again, we disagree. In State v. Broughton (1991),62 Ohio St.3d 253, 258, 581 N.E.2d 541, the Supreme Court of Ohio held:
 For purposes of computing how much time has run against the state under R.C. 2945.71 et seq., the time period between the dismissal without prejudice of an original indictment and the filing of a subsequent indictment, premised upon the same facts as alleged in the original indictment, shall not be counted unless the defendant is held in jail or released on bail pursuant to Crim. R. 12(I).[3]
Id. at paragraph one of the syllabus. In State v. Buck (April 20, 1999), Ross App. 98CA2438, 1999 WL 253485, where we acknowledgedBroughton, we found that a municipal court's failure to explicitly state in its dismissal entry under Crim. R. 48(A) that *Page 15 
the defendant was released from bail, did not necessarily result in the defendant's bail being continued under Crim. R. 12(I) for purposes of his speedy trial rights. Id. at *5. Under R.C. 2937.22, "bail" is "security for the appearance of an accused to appear and answer to a specific criminal or quasi-criminal charge in any court or before any magistrate at a specific time or at any time to which a case may be continued * * *." As we noted in Buck, supra, R.C. 2937.40(C) provides that bail of any type "shall be discharged and released to the accused, and property pledged by an accused for a recognizance shall be discharged, upon the appearance of the accused in accordance with the terms of the recognizance or deposit and the entry of judgment by the court * * *." Moreover, we noted that "the preeminent purpose of bail is to `insure that the defendant appears at all stages of the criminal proceedings.'" See Buck, supra, at *6, citing State ex rel. Pirman v. Money (1994),69 Ohio St.3d 591, 595, 635 N.E.2d 26.
 {¶ 28} Here, when the case was bound over to the grand jury, the court continued Alexander's bond "for the appearance in the Scioto Court of Common Pleas for trial pursuant to indictment by the Scioto County Grand Jury." When the grand jury failed to indict Alexander and the murder charge was no longer pending against him, his bail obligations were extinguished by operation of law. But, see, State v. Scott (Oct. 18, 1990), Cuyahoga App. No. 59485, 1990 WL 156073 (holding that "the relevant time was not tolled by the grand jury's initial return of a no bill in view of defendant being held under bail after such finding.").
 {¶ 29} Thus, we agree with the trial court's conclusion that there was no charge "pending" against Alexander from the time of the grand jury's "no bill" on November 19, 2003 through August 26, 2005, i.e., the date he was subsequently indicted, and that the *Page 16 
State is not charged with this time under R.C. 2945.71. Therefore, the total time charged against the State from the day following Alexander's initial arrest and his subsequent indictment is 100 days.
 {¶ 30} Alexander has not separately briefed and argued that any delays, other than those attributable to the "case pending" argument are chargeable to the State under the statute. Thus, we do not address who is chargeable with the additional periods of delay. See App. R. 12(A). Because the charge was not pending between the discharge of the original grand jury and the issuance of an indictment by the new grand jury, there was no violation of Alexander's statutory right to a speedy trial.
 B. Constitutional Right to Speedy Trial {¶ 31} Alexander also contends that the State violated his constitutional right to a speedy trial. He contends that the State failed to act diligently by allowing his case to remain pending for over two years before finally acquiring an indictment and then allowing it to remain pending for another 18 months prior to his arraignment. He argues that this "presumptively prejudicial" delay violated his constitutional right to a speedy trial.
 {¶ 32} In analyzing whether an accused has been denied the constitutional right to a speedy trial, a court must consider four factors: (1) the length of the delay; (2) the reason for the delay; (3) the accused's assertion of his right; and (4) prejudice to the accused.Barker v. Wingo (1972), 407 U.S. 514, 530, 92 S.Ct. 2182,33 L.Ed.2d 101. None of these four factors is determinative of whether an accused suffered a violation of his constitutional right to a speedy trial. Id. at 532. Instead, the court must consider the factors collectively, i.e., by weighing the conduct of both the State and defendant. Id. *Page 17 
 {¶ 33} The United States Supreme Court has recognized that the first factor, length of the delay, involves a double inquiry. Doggett v.United States (1992), 505 U.S. 647, 651, 112 S.Ct. 2686,120 L.Ed.2d 520. First, an accused must show that the length of the delay was "presumptively prejudicial" in order to trigger the Barker analysis. Id. at 651-52. Once the Barker analysis is triggered, length of delay, beyond the initial threshold showing, is again considered and balanced against the other relevant factors. Id. at 652.
 {¶ 34} As the Doggett decision noted, courts generally find post-accusation delay to be "presumptively prejudicial" as it approaches one year. Doggett at 652, fn. 1. The Supreme Court of Ohio has held that the filing of a criminal complaint triggers the "post-accusation" speedy trial inquiry under Barker. State v. Selvage, 80 Ohio St.3d 465, 468,1997-Ohio-287, 687 N.E.2d 433, citing Doggett at 655 (noting that "[o]nce triggered by arrest, indictment, or other officialaccusation, however, the speedy trial enquiry must weigh the effect of delay on the accused's defense just as it has to weigh any other form of prejudice that Barker recognized."). Here, the State filed its initial complaint against Alexander in July 2003, but the case did not proceed to trial until February 2008. Because this post-accusation delay exceeded one year, we find that it was presumptively prejudicial. However, that finding does not end our inquiry, as Alexander suggests. Rather, it merely triggers the Barker analysis.
 {¶ 35} We will first address Alexander's claim concerning the delay between his initial arrest in August 2003 and his indictment in August 2005. We begin our analysis by noting that the length of the delay is approximately two years. However, we will consider and discuss this factor together with the second factor, the reason for the delay. *Page 18 
 {¶ 36} The United States Supreme Court has recognized that different weights are to be assigned to different reasons for delay.Doggett at 657, citing Barker at 531. Concerning negligence, the Court stated:
 Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies with its protractedness * * * and its consequent threat to the fairness of the accused's trial. * * * To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice.
Id. The Court also noted, however, that pre-trial delay is often both "inevitable" and "wholly justified" noting, for example, that the government may need time to "collect witnesses against the accused." Id. at 656.
 {¶ 37} Alexander does not contend that the State acted with a deliberate intent to harm his defense in failing to obtain an indictment; rather, he claims the State failed to exercise "due diligence." The State contends that it had a justifiable reason for the delay because witnesses refused to cooperate with the investigation. The record shows that the grand jury returned a "no bill" approximately three months after Alexander was arrested. The record also suggests that prior to his indictment, witnesses failed to cooperate with the investigation. Detective Charles testified at trial that only after they got a "major break" in the case in mid 2004 when Dawson came forward with information, did the investigation "accelerate." Moreover, during the hearing on Alexander's motion to dismiss, Detective Charles testified that he appeared before the grand jury in 2003 and testified concerning this case. He also testified that he attempted to locate witnesses to *Page 19 
appear before the grand jury, that he had difficulties with certain witnesses, and that he and other officers and investigators attempted to locate witnesses for different grand jury dates in 2003. He also indicated that some of the witnesses subpoenaed failed to appear before the grand jury. Thus, it appears that at least some of the delay resulted from the State's legitimate investigational concerns and its inability to "collect witnesses." Prior to indicting Alexander, the State was entitled to ascertain that it would have enough evidence to proceed to trial. State v. Metz (April 21, 1998), Washington App. No. 96CA48, 1998 WL 199944, citing United States v. Thomas (C.A.11, 1995),62 F.3d 1332, 1339, certiorari denied, 516 U.S. 1166, 116 S.Ct. 1058,134 L.Ed.2d 202 (stating that prosecutors need not indict as soon as they have enough evidence to indict; prosecutors may delay indictment until they are satisfied that they have sufficient evidence to establish guilt beyond a reasonable doubt). Even if we assume that the State did not act as diligently as it could have in this case, we conclude that this factor does not weigh heavily against the State because, given the circumstances, the 2-year delay was not so protracted or intolerable as to warrant relief absent some particularized trial prejudice.
 {¶ 38} As for the third factor, Alexander did not assert his right to a speedy trial until after he was arraigned in 2008. Under the circumstances of this case, however, we will assign no fault to him for failing to assert his speedy trial rights during the 2-year delay prior to his indictment. Alexander clearly knew that the State had filed its initial complaint against him in July 2003 when he was arrested the following month and released on bail, thus triggering the "post-accusation" delay. However, the grand jury subsequently issued a "no bill" against Alexander, and as we have previously determined, the court did not have jurisdiction over any pending charges against Alexander until his later indictment. *Page 20 
However, as discussed in more detail below, Alexander did not assert his speedy trial rights upon learning of the indictment; rather, he waited several months until after his arraignment. Accordingly, we find that this third factor weighs slightly against Alexander.
 {¶ 39} The final factor we must consider is the prejudice to the accused. In Barker, the United States Supreme Court identified three interests that the speedy trial right is designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker at 532. The first interest is not implicated here because Alexander was not incarcerated during the time between his initial arrest and his indictment. Second, while Alexander may have experienced anxiety and concern following his initial arrest, the grand jury returned its "no bill" against him within approximately three months. Any resulting anxiety should have been minimal. As for the last interest, Alexander does not allege that the delay impaired his ability to defend himself. Indeed, Alexander fails to allege that he suffered any actual prejudice as a result of the post-accusation delay. Thus, this factor weighs heavily against Alexander.
 {¶ 40} Carefully balancing these factors, we conclude that Alexander did not suffer a violation of his constitutional right to a speedy trial as a result of the 2-year delay between his arrest and his indictment.
 {¶ 41} Next, we turn to Alexander's claim concerning the delay between his indictment and his arraignment. Again, we begin our Barker analysis by considering the length of this 18-month delay, together with the reason for the delay. Alexander does not argue that the State acted intentionally; he simply alleges that the State failed to exercise *Page 21 
"due diligence." The State, on the other hand, contends that during this time Alexander was a fugitive from justice and was later incarcerated on other charges.
 {¶ 42} We look first to the reason for the delay between his indictment and his subsequent arrest. The record shows that a warrant was issued for Alexander's arrest following his indictment, but the record is unclear concerning what steps the State took serve the warrant on Alexander. However, at the hearing of the motion to dismiss, Detective Charles testified that he was involved in trying to get that warrant served. He also testified that he was present with a fugitive task force in Columbus when Alexander was served with the indictment (or the probation violation stemming from the indictment). In its decision overruling his motion to dismiss, the trial court found that Alexander was a "fugitive avoiding apprehension" during this time, a finding Alexander does not dispute. Where a defendant himself causes the delay by absconding and the government uses reasonable diligence in pursuing him, a speedy trial claim rings hollow. See Doggett at 656. Accordingly, we find that Alexander was more to blame than the State for the delay between his indictment and his subsequent arrest.
 {¶ 43} Next we consider the reason for the 4-month delay between his arrest and arraignment. Alexander contends that shortly after his arrest at the Rule 4 hearing in Franklin County, the court ordered Scioto County to transfer Alexander back to Scioto County within five days but that he nonetheless remained in the Franklin County jail on the probation violations and was eventually sent to prison on these other charges. The State offers no explanation for the delay other than the fact that Alexander was held on other charges and later sent to prison during this time. Based on our review of the record, we conclude that the State did not act as diligently as it could have during this time. *Page 22 
Without a justifiable reason for the delay, we find that the State was more to blame for this delay than Alexander.
 {¶ 44} Concerning the third factor, again we note that Alexander did not assert his right to a speedy trial until after his arraignment. However, the record clearly shows that he had knowledge of the indictment against him in November 2006 when he was arrested and held on the warrant in this case. Specifically, on November 13, 2006, he appeared in court for a hearing concerning the arrest warrant in this case. Furthermore, despite the fact that he had knowledge of the indictment, the record shows that Alexander never requested final disposition of his indictment under R.C. 2941.401[4] while he was incarcerated on the other charges. Thus, we conclude that his failure to assert his speedy trial rights upon learning of the pending indictment weighs against Alexander.
 {¶ 45} Looking at the final factor, we must consider the prejudice to Alexander by reviewing the three interests that the speedy trial right is designed to protect. Although Alexander was incarcerated during this time, he was also being held on probation violations and was then sent to prison on those charges. Thus, his confinement does not amount to oppressive pretrial incarceration. Second, while Alexander may have experienced some anxiety and concern during this time, we conclude it was minimal in light of the fact that he never requested a final disposition of his indictment in this case under R.C. 2941.401. Third, Alexander does not even allege, let alone establish, that the delay impaired his defense or otherwise resulted in any actual prejudice. *Page 23 
 {¶ 46} Again, after carefully balancing the Barker factors, we conclude that Alexander did not suffer a violation of his constitutional right to speedy trial. Therefore, we overrule Alexander's first assignment of error.
 V. Evid. R. 612 {¶ 47} Alexander contends that the trial court erred in refusing to permit defense counsel to review various police reports law enforcement officers used to refresh their recollection prior to their trial testimony. He also argues that the trial court indicated that it would seal the reports and make them part of the record for appeal and that its failure to do so constitutes error.
 {¶ 48} Our review of the record shows that Officer Kelly testified on cross-examination that he prepared an incident report in connection with his involvement in the case, that he reviewed a copy of the report while sitting out in the hallway prior to his testimony, and that he had it with him. Detective Hutchens testified on cross-examination that he had previously prepared a written summary of his activities on the day of the incident, that he reviewed it before testifying, but that he did not have it with him. Finally, Officer Nagle testified on cross-examination that he prepared an addendum to a report concerning his duties on the day of the incident and that he reviewed it before coming to testify.
 {¶ 49} Alexander contends the court should have allowed him to review the materials the officers reviewed by virtue of Evid. R. 612, which provides, in part:
 Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1)(d) of the Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to *Page 24 
inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portion not so related, and order delivery of the reminder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. * * * (emphasis added).
 {¶ 50} Thus, Evid. R. 612 expressly gives trial courts discretion to decide whether to order production of a writing used by a witness prior to testifying. See State v. Miller (March 18, 1996), Meigs App. No. 94CA9, 1996 WL 135447, citing State v. Byrd (1987), 35 Ohio App.3d 100,102, 519 N.E.2d 852, 855 (noting that in deciding whether to require the production of a writing that a witness reviewed before testifying, the court should consider (a) the apparent extent of the witness's reliance on that writing, (b) the significance of the data recalled by that reliance, (c) any resulting burden on another party, and (d) any potential disruption of orderly proceedings). However, Evid. R. 612 contains an important exception with its express reference to Crim. R. 16(B)(1)(g), [5] which states:
 (B) Disclosure of evidence by the prosecuting attorney
 (1) Information subject to disclosure
 * * *
 (g) Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
 If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies. *Page 25 
 If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
 {¶ 51} Crim. R. 16(B)(2), however, goes on to specifically address information that is not subject to disclosure by the prosecuting attorney, and states: "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." Moreover, the Supreme Court of Ohio has held that only those portions of a police officer's signed report that include the officer's observations and recollections constitute "statements" under Crim. R. 16(B)(1)(g). SeeState v. Cunningham, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, at ¶ 43. "Those portions which recite matters beyond the witness' personal observations, such as notes regarding another witness' statement or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim. R. 16(B)(2)." Id.
 {¶ 52} Thus, while Evid. R. 612 gives trial courts discretion to decide whether to order production of a writing used by a witness prior to testifying, that rule is expressly subject to Crim. R. 16(B), which specifically controls the production of police reports. Therefore, police reports are precluded from inspection under Evid. R. 612.State v. Cummings (1985), 23 Ohio App.3d 40, 491 N.E.2d 354. Furthermore, the Staff Notes of Evid. R. 612 provide that the discretion given to the judge by the rule "serves to avoid the rule being used as an additional method of discovery, particularly as to work product and pretrial preparation." Cummings at 45, citing Staff Notes of Evid. R. 612; see, also, State *Page 26 v. Wells (1992), 83 Ohio App.3d 147, 614 N.E.2d 793 (noting that a defendant may not use Evid. R. 612 as an additional method of discovery).
 {¶ 53} Finally, Ohio courts have held that "in the trial of a criminal case an accused's counsel is not entitled to inspect a written police report where an officer does not use the report while testifying notwithstanding the fact that he has read it to refresh his recollection prior to taking the witness stand." State v. Wilson (1985),23 Ohio App.3d 111, 114, 491 N.E.2d 715, citing State v. Smith (1976),50 Ohio App.2d 183, 201, 362 N.E.2d 1239; see, also, Cummings, supra, both of which reject Evid. R. 612 as a legitimate basis for requiring production of police reports at trial.
 {¶ 54} Even if we assume that Evid. R. 612 did not except police reports from its scope, we would find no reversible error. After defense counsel requested permission to review Officer Kelly's report, the court held a bench conference, during which defense counsel stated:
 Mr. Tyack: I am not sure whether we got it on the record or not but I want it on the record that in fact counsel did provide me with a copy of this man's summary as Brady material consistent with the testimony. Now what I want to do but I want to make sure I am not stepping on anyone's toes, he said he thought it was something. I was simply going to hand it to him, not put it in evidence but have him read to himself the sentences and see if it refreshed his memory. The only thing I want to get into is he [Payton] said he had been shot by a white man and he didn't know his name. [emphasis added].
 {¶ 55} During Detective Hutchens' testimony, after he testified that he had prepared a written summary, defense counsel simply stated:
 Q. Your Honor, I'd make the same request as before and I'll assume it will be the same ruling.
 {¶ 56} Later, Officer Nagle gave the following testimony on direct examination: *Page 27 
 Q. Officer, as you waited there in the living room was the victim in this case, Mr. Payton, was he conscious?
 A. He was lying on the floor and he stated that he had been shot.
 Q. Did he make any, what was his condition when you arrived? Could you describe his injuries?
 A. I believe he was holding his stomach but it's been so long I don't remember exactly, I mean exactly where his hands were and tuff [sic], but he said he'd been shot.
 Q. Did he appear to be seriously injured?
 A. I think so sir, yes sir.
 Q. Did he make a statement about who had shot him?
 A. He said he had been shot by a male. I thought he said a white male, but I don't want to, it's been so long I don't remember exactly sir.
 {¶ 57} Then, on cross-examination, he testified:
 Q. Officer, as a result of your performing your duties on that particular day you prepared a document, basically an incident report?
 A. An addendum to the report, yes sir.
 Q. Wrong language on my part, I apologize. Have you reviewed that before coming here today?
 A. Yes sir.
 Q. Okay, and specifically let me do this, we're not going to put it into evidence but I have a right to try to clarify one point if we may. If I may approach Judge?
 THE COURT: Sure
 Q. Officer, I've taken the liberty of underlining so you don't need to go through the whole report, one phrase or one sentence. If you could take a look and review that underlined portion.
 A. Okay.
 Q. Does that clarify your memory as to what the gentlemen told you? *Page 28 
 A. Correct.
 Q. And what did he tell you?
 A. He said that a white guy shot him and he didn't know his name or whether it was inside or outside.
 {¶ 58} Thus, the record reflects that defense counsel was given a copy of Officer Kelly's summary, which contained the victim's statement that he was shot by a "white guy" as Brady material under Crim. R. 16(B)(1)(f). It also shows that defense counsel initially sought review of Officer Kelly's report for the sole purpose of questioning Officer Kelly about that statement. Defense counsel then made the "same request" concerning Detective Hutchens' report. Later, defense counsel actually elicited testimony from Officer Nagle concerning the statement, and Officer Nagle specifically testified that the victim had told him that he was shot by a "white guy." Thus, Alexander cannot establish any resulting prejudice from the trial court's decision not to produce the reports because the purpose of the production was satisfied by Officer Nagle's testimony, and the similar disclosure of Brady material, i.e., Kelly's summary under Crim. R. 16(B)(1)(f). Therefore, we overrule Alexander's second assignment of error.
 VI. Manifest Weight of the Evidence {¶ 59} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983), *Page 29 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt. State v. Johnson (1991),58 Ohio St.3d 40, 41, 567 N.E.2d 266; State v. Eskridge (1988), 38 Ohio St.3d 56,526 N.E.2d 304, paragraph two of the syllabus.
 {¶ 60} Even in acting as a thirteenth juror we must still remember that the weight to be given evidence, and the credibility to be afforded testimony, are issues to be determined by the trier of fact. State v.Dye (1998), 82 Ohio St.3d 323, 329, 1998-Ohio-234, 695 N.E.2d 763;State v. Frazier (1995), 73 Ohio St.3d 323, 339, 1995-Ohio-235,652 N.E.2d 1000. The fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of proffered testimony."Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273. Thus, only if the fact finder clearly lost its way and created a manifest miscarriage of justice will we interfere.
 {¶ 61} Alexander contends that his murder conviction is against the manifest weight of the evidence because the evidence presented only justified a conviction for voluntary manslaughter. R.C. 2903.02(A) sets forth the offense of murder and states: "[n]o person shall purposely cause the death of another * * *." "A person acts purposely when it is his specific intent to cause a certain result, or when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Intent may be inferred from the circumstances surrounding the crime." State v.Herring, 94 Ohio St.3d 246, 266, 2002-Ohio-796, 762 N.E.2d 940; see, also, *Page 30 State v. Treesh (2001), 90 Ohio St.3d 460, 484-485, 2001-Ohio-4,739 N.E.2d 749 ("Because the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances, and the General Assembly has provided that intent to kill may be proven by inference.") Furthermore, the Supreme Court of Ohio has stated that circumstantial evidence and direct evidence inherently possess the same probative value. State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph one of the syllabus (superseded by state constitutional amendment on other grounds). Finally, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." State v. Sullivan, Franklin App. No. 07AP247, 2008-Ohio-391, ¶ 13, citing State v.Sevilla, Franklin App. No. 06AP954, 2007-Ohio-2789, at ¶ 10. And an accused's specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death. Sullivan at ¶ 13, citingState v. Waddell (Aug. 15, 2000), Franklin App. No. 99AP1130,2000 WL 1154289.
 {¶ 62} Voluntary manslaughter is an inferior degree of murder.State v. Sudderth, Lawrence App. No. 07CA38, 2008-Ohio-5115, ¶ 12, citing State v. Shane (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. R.C. 2903.03(A) defines "voluntary manslaughter" and provides: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." *Page 31 
 {¶ 63} Alexander's murder conviction is not against the manifest weight of the evidence. The State presented substantial direct and circumstantial evidence to prove that Alexander shot and killed Payton and that he did so "purposely." In describing the altercation between Alexander and Payton, Dawson testified that immediately prior to the shooting, Alexander stated: "somebody better get this nigger off of me before I shoot him." She also testified that at that point D-Rock stepped in and that D-Rock and Alexander then pushed Payton toward the couch. She then saw Alexander shoot Payton, as D-Rock held him down on the couch. Moreover, Bell testified that she witnessed the fight between Alexander and Payton and that she observed Alexander pull out a gun and shoot Payton. Furthermore, Berry testified that he observed the fight. According to Berry, D-Rock stepped in and tried to break up the fight and that in trying to "stand between everything," D-Rock pushed Alexander over to the corner of the wall. Berry also testified that while D-Rock was holding Payton down, Alexander was over on the other side of the wall in the corner; Alexander then pulled his pistol out, "ran" over to the couch, and shot Payton in the side, close to his kidney. Finally, Detective Charles testified that he recovered an unspent shell casing on the living room floor that was the same caliber of the bullet that killed Payton and offered an explanation as to why and how a person may have ejected it from the gun in an effort to verify that the gun was loaded.
 {¶ 64} Thus, the evidence presented at trial indicates that just prior to the shooting Alexander expressed a specific intent to shoot Payton and that he did in fact pull out a gun and shoot him. The evidence also suggests that prior to the shooting D-Rock had attempted to separate Alexander from Payton by pushing Alexander over on the other side of the wall in the corner. However, Alexander then pulled out his firearm, *Page 32 
"ran" over to the couch, where D-Rock was holding Payton down, and shot Payton in his side. Under these circumstances, Alexander's use of a firearm, an inherently dangerous instrumentality, was reasonably likely to produce death. His act of pointing a loaded firearm and firing it into Payton's side while Payton was being restrained, causing a "contact" wound on his lower back near his kidney, is an act with death as a natural and probable consequence. Thus, Alexander's specific intent to kill may be reasonably inferred from circumstances. Based on all of the evidence presented in this case, we conclude that any rational fact finder could have found, beyond a reasonable doubt, all of the essential elements of the offense of murder.
 {¶ 65} Alexander argues that the evidence only supports a voluntary manslaughter conviction because a single shot was fired and the shooting occurred after he and Payton were engaged in an altercation, during which Payton behaved in an "aggressive fashion." Based on our review of the evidence, however, we conclude that the jury did not clearly lose its way in finding Alexander guilty of murder rather than voluntary manslaughter. While the evidence shows that Alexander and Payton were involved in an altercation, the testimony presented at trial demonstrates that Alexander was primarily responsible for causing the underlying argument that led to the physical confrontation. Specifically, the evidence showed that the argument stemmed from Alexander's actions during the dice game. Dawson testified that during the game Alexander was taking D-Rock's money and that Alexander allowed the initial argument between D-Rock and Payton to become "heated" rather than admitting that he had in fact taken the money. She also testified that Alexander then began "patting" Payton on the chest, trying to make it seem like Payton was "trying to play D-Rock and he wasn't." Bell testified that the fight was *Page 33 
over Payton "supposedly" not putting in his money. And Berry testified that Payton had "called the dice" but that Alexander rolled anyway; then, when Berry raised the issue, Alexander got mad. Moreover, both Dawson and Berry testified that Alexander punched Payton first and that only after being struck did Payton strike back. Finally, Berry's testimony suggested that Alexander had been physically separated from Payton and that Payton was being held down at that time of the shooting. Based on these facts, the jury could have reasonably concluded that Payton's actions in striking back were not reasonably sufficient to incite Alexander, the initial aggressor, into using deadly force. Thus, the jury did not clearly lose its way in finding that Alexander's actions were not the result of a justifiable rage brought on by serious provocation of the victim. Therefore, we overrule Alexander's third assignment of error.
 VII. Conclusion {¶ 66} Having overruled each of the assignments of error, we affirm the trial court's judgment.
JUDGMENT AFFIRMED. *Page 34 
 APPENDIX {¶ 67} During the early morning hours of July 6, 2003, Jordon Payton was fatally shot at a party at Nishigail McArtis' apartment in Portsmouth, Ohio. Several people who were present at the party testified on behalf of the State. McArtis testified that she planned for the party to start after the Silver Moon, a local bar, closed at 2:30 a.m. She testified that she was intoxicated at the party, but that she remembered a "serious amount" of people were there, including Alexander and Payton. She testified that at one point a "dice game" was going on upstairs, but that it stopped following an argument. Later, while she was outside, she heard a gunshot. As everyone was "scattering," she ran inside and discovered Payton lying on the living room floor, bleeding, and holding his stomach. She also testified that there was damage to the wall in her living room that was not there before the party.
 {¶ 68} Torrien ("Torry") Butler testified that he arrived at the party after the bar closed and that there were approximately 30 people there, including Alexander and Payton. He stated that he brought dice to the party to gamble. He stated that people were upstairs talking about playing dice, but that they could not get the game going due to "too much complications" over "money issues." He later testified that they were playing craps, but that an argument ensued because "Mike" was not putting his money down. He testified that he got upset, "threw the dice away" and left the party prior to the shooting.
 {¶ 69} Moniqua Davis-Dawson, a neighbor, arrived at the party at some point between 2:00 a.m. and 3:00 a.m., after it had already started. She testified that when she arrived outside the apartment, a fight was about to break out between her cousin, Torry Butler, and Mike Lowery, but that it "got stopped." She testified that Alexander broke up the fight outside and that during the "physical confrontation" of Alexander trying to "keep the peace," Alexander's gun fell out of his pants. She testified that there were "a lot" of other people outside when the gun fell out.
 {¶ 70} Dawson further testified that about 45 minutes later she observed a fight between Alexander and Payton. She explained that by the time she got inside the apartment, Payton was playing dice in the living room with several other people, including Alexander and "D-Rock." She stated that throughout the dice game, Alexander kept "picking up D-Rock's money and stuff, laughing and winking at my cousin and stuff like that." At one point, Payton won the bet and wanted his money from D-Rock, but D-Rock thought that Payton had already taken his money. Alexander did not explain to D-Rock that he was the one who had actually picked up the money and did not give the money to Payton. Rather, Alexander allowed it to become a "heated argument" between Payton and D-Rock. Dawson *Page 35 
testified that Alexander then stepped in and began patting Payton on the chest, trying to make it seem like Payton was "trying to play D-Rock and he wasn't." Alexander then punched Payton. According to Dawson, Payton then hit him back and "took control of the situation." Payton grabbed Alexander and slammed his head into a wall with enough force to break the plaster and then pinned him in a chair. At that point, Alexander stated: "somebody better get this nigger off of me before I shoot him." As D-Rock began pulling Payton off of Alexander, Dawson's "cousin," Ivy Bell, began pulling Dawson out of the room towards the back door. Dawson testified that when she looked back, she saw D-Rock and Alexander pushing Payton toward the couch. She then saw Alexander shoot Payton once as D-Rock held Payton down on the couch. Payton then fell from the couch to the floor. D-Rock and Alexander then ran from the apartment. Dawson testified that she stayed with Payton until the medics arrived. Later, she went driving with several other people and eventually ended up at Farley Square, where they met up with Alexander and D-Rock. Alexander expressed remorse and stated, "I can't believe this happened. I didn't mean to shoot Jordon."
 {¶ 71} Ivy Bell testified that she was at the party and observed the altercation between Alexander and Payton. She testified that the fight was over a dice game and that "supposedly" Payton had not put his money down. She stated that they started fighting about the money and shortly thereafter, Alexander pulled out a gun and shot Payton.
 {¶ 72} Jonathon Berry testified that he arrived at the party after the bar closed at 2:30 a.m. He testified that he was upstairs shooting dice with Payton, Alexander, D-Rock, Mike Lowery, and "Turk" and that there was an argument between Turk and Mike. After the argument, the dice game upstairs ended, and D-Rock, Alexander, Turk, and Mike left and went outside, leaving Berry and Payton upstairs. Later, they came back inside the apartment and hollered upstairs about starting up the dice game downstairs. Berry and Payton went downstairs, where Alexander and D-Rock were waiting. Berry testified that they began shooting dice, with Berry and Payton betting against Alexander and D-Rock. They played dice for about 30 minutes. Berry testified that at some point when Alexander got the dice, Payton "called the dice" before Alexander rolled the dice, but that Alexander rolled the dice anyway. He stated that Alexander grabbed up all the money off the ground, which was approximately $700.00, and that there was a "whole lot of commotion." Berry testified that he told Alexander that "yeah he did call them man, before they came out," at which point Alexander got mad and punched Payton. According to Berry, Payton then grabbed Alexander and punched him three times. D-Rock then stepped in, tried to break up the fight, and pushed Alexander over to the corner of the wall. D-Rock was trying to hold Payton down and trying to "stand between everything." Berry testified that while D-Rock was holding Payton, *Page 36 
Alexander was over on the other side of the wall in the corner. Alexander then pulled his pistol out, "ran" over to the couch, and shot Payton in the side, close to his kidney.
 {¶ 73} Beverly Flowers arrived at the party shortly after 2:30 a.m. Flowers testified that she was not there long before she left to go get ice from Kroger. Less than 10 minutes after she returned, an argument started in the living room, where a group of men, including Alexander, were playing dice. She testified that about the time the argument broke out, she received a call on her cell phone and walked outside. Shortly thereafter people came rushing out of the apartment, and she then heard a gunshot from the apartment. Flowers stated that she started walking to her car, which was parked in an alley behind the apartment. She testified that Alexander exited the apartment through the back door, "walking briskly," and asked her for a ride. She agreed. While in the car, Alexander stated "Oh my God, I just shot him over $30.00." She testified that Alexander called his dad and expressed remorse and confusion; he also told his dad that he needed to get back home to Columbus. She testified that Alexander also called Devon Jones, whose street name is "D-Rock", and that he also placed a call to try to make sure that the victim got medical treatment. She testified that they first drove to the Sixteenth Street apartments, then Farley Square, and then to New Boston.
 {¶ 74} Fred Johnson testified that he was at the party for about 45 minutes, but that he left because he was intoxicated. He testified that he later learned of what happened to Payton. He stated that two days after the shooting, he had a conversation with Alexander and asked him about what happened. Johnson testified that Alexander just said "stuff got out of control" and that they left it at that.
 {¶ 75} Kathy Groves, a 911 dispatcher for the City of Portsmouth, testified that at approximately 4:30 a.m., she received several calls regarding someone being shot. Officer Christopher Kelly with the Portsmouth Police Department testified that he was dispatched to the area of 529 Third Street, Apartment A and that he arrived within minutes. When he arrived, several people had already left the area and several others were running from the apartment. Inside the apartment, he discovered a small group of both male and female black individuals pointing to an individual who was laying in the living room. Officer Kelly testified that the victim, later identified as Payton, was bleeding from both the abdomen or belly and also from his back. He testified that the wound appeared to be a "through and through gunshot wound." He testified that he spoke with McArtis and others who had not left the scene and maintained control of the scene until backup officers arrived. *Page 37 
 {¶ 76} Officer Tim Nagle with the Portsmouth Police Department testified that he was dispatched to the scene to assist Officer Kelly. Officer Nagle testified that when he entered the apartment, he observed a black male, who appeared to be seriously injured, lying on the living room floor holding his stomach. Officer Nagle testified that the victim indicated that he had been shot by a male and that he believed the victim said a "white male," but that he did not exactly remember. On cross-examination, defense counsel presented Officer Nagle with a report that he had previously prepared and reviewed prior to his testimony. Upon reviewing the report, Officer Nagle testified that it clarified his memory and that the victim told him that a "white guy shot him and he didn't know his name or whether it was inside or outside."
 {¶ 77} Detective James Charles with the Portsmouth Police Department testified that when he arrived at the scene, Payton had already been transported to the hospital. He testified that after he called Detective Pat Hutchens and told him to respond to the hospital, he began searching the living room for evidence. He stated that after Detective Hutchens arrived at the apartment, they began processing the scene together. Detective Charles testified that they discovered a live .40 caliber round laying on the floor just inside the front door and found a shell casing near the love seat. Later, they discovered a tear in the fabric in the cushion of the love seat throw pillow. Detective Charles testified that he cut the fabric open and found a spent .40 caliber bullet in the foam cushion. The bullet tested positive for the presence of blood. Detective Hutchens also generally testified concerning how they processed the scene and their collection of evidence. Detective Charles also testified concerning his theory about why they found a live .40 caliber round laying on the floor. He suggested that a person who may not know whether his semi-automatic weapon was loaded may pull the slide back and let it go forward to insure that there is a round in the chamber. He explained that if there was a live round in the chamber when they pull the slide back, the extractor would throw the live round out and then re-chamber another live round. He testified that he suspected that "the person pulled the slide back to insure that the gun was going to be loaded, let it go before it was fired, throwing out a live round, chambering the second live round." Finally, he testified that they finished processing the scene sometime before 12:00 noon, and learned later that day that Payton had died.
 {¶ 78} Finally, Dr. Gary Utz, a forensic pathologist with the Hamilton County Coroner's Office, testified that he performed the autopsy on Payton. He testified that Payton died as a result of an exsanguinating hemorrhage that was due to a gunshot wound, i.e., he bled to death. He testified that the entrance wound, which was consistent with a "contact" wound, was located on the lower right side of his back and the exit wound was on his left lower chest. In describing the characteristics of the exit wound, he testified *Page 38 
that it appeared to be a "shored exit," which he explained occurs when there is an article of clothing, furniture, or some other item pressing against the skin when the bullet exits. He testified that the exit wound was consistent with a person who had been laying or pushed on a pillow on a couch.
 {¶ 79} After the State rested, the defense presented no witnesses. *Page 39 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Abele, J.: Concur in Judgment and Opinion.
[1] Crim. R. 46 governs the conditions imposed on a person who has been released on bail.
[2] R.C. 2939.24 provides that such a person shall be discharged under certain circumstances, including "(D) The grand jury, for good cause shown, continues the hearing of said charge until the next term of court."
[3] Crim. R. 12(I), now Crim. R. 12(J), provides in part:
 (J) Effect of determination If the court grants a motion to dismiss based on a defect in the institution of the prosecution or in the indictment, information, or complaint, it may also order that the defendant be held in custody or that the defendant's bail be continued for a specified time not exceeding fourteen days, pending the filing of a new indictment, information, or complaint.
[4] R.C. 2941.401 provides a mechanism for a defendant who is incarcerated on a different conviction to demand the State to proceed with unresolved and outstanding charges.
[5] The rule also refers to Crim. R. 16(C), which governs the disclosure of evidence by the defendant.